**F I L E D**

**PUBLISH**

**August 10, 2007**

UNITED STATES COURT OF APPEALS

TENTH CIRCUIT

---

ECCLESIASTES 9:10-11-12, INC.,

Plaintiff - Appellant,

and

DELOREAN MANUFACTURING
COMPANY; CRISTINA
CORPORATION; JOHN Z.
DELOREAN,

No. 05-4192

Plaintiffs,

v.

LMC HOLDING COMPANY; LMC
OPERATING CORPORATION; LMC
TENANT CORPORATION; PAUL
WALLACE; LAWRENCE LOPATER,

Defendants - Appellees.

---

Appeal from the United States District Court
for the District of Utah
(No. 1:95-CV-3-TS)

---

Reid Lambert, Woodbury & Kesler, Salt Lake City, UT, (Edgar Boles, Moriarty &
Jaros, PLL, Pepper Pike, Ohio, with him on the brief), for Plaintiff-Appellant.

Christopher Johnson, Kasowitz, Benson, Torres & Friedman, LLP, New York
City, NY, (Wayne G. Petty, Moyle & Draper, Salt Lake City, UT, with him on the
briefs), for Defendants–Appellees.

Before **BRISCOE**, **HOLLOWAY**, and **HOLMES**, Circuit Judges.

**HOLMES**, Circuit Judge.

This appeal challenges the district court's decision to dismiss this action with prejudice for failure to prosecute pursuant to Fed. R. Civ. P. 41(b). The district court dismissed this case, which originally was commenced in 1995, as a sanction for the alleged discovery-related dilatoriness of appellant Ecclesiastes 9:10-11-12, Inc. ("Ecclesiastes"). This delay allegedly precluded the parties from preserving the deposition testimony of John Z. DeLorean prior to his death. At times material to the dismissal, DeLorean was Ecclesiastes's sole director, its corporate designee pursuant to Fed. R. Civ. P. 30(b)(6), and Ecclesiastes's only witness with first-hand knowledge of the factual underpinnings of the litigation.

We hold that the district court did not abuse its discretion in granting defendants' motion for dismissal pursuant to Rule 41(b). Thus, we **AFFIRM** the district court's judgment.

I.    **BACKGROUND**

A.    **Asset Purchase Agreement**

On December 2, 1992, DeLorean and three corporations he directly and indirectly controlled, Logan Manufacturing Company ("Logan"),[1] DeLorean

---

[1]    After the execution of the APA, Logan changed its name to Ecclesiastes.

(continued...)

Manufacturing Company ("DeLorean Manufacturing"), and Cristina Corp. ("Cristina") (collectively "plaintiffs"), entered into an asset purchase agreement ("APA") with LMC Holding Co. ("LMC Holding") for the sale of plaintiffs' snow-grooming equipment business.[2] Paul Wallace specifically formed LMC Holding to acquire plaintiffs' assets. DeLorean and Wallace negotiated the terms of the APA.

Pursuant to the APA, LMC Holding was to pay a purchase price of $12,750,000, subject to certain closing and post-closing "adjustments" (the "purchase-price adjustments"). The APA placed responsibility on plaintiffs for producing the necessary financial documentation to calculate the purchase-price adjustments. This included audited financial statements for the fiscal year that ended on November 30, 1992. Because closing took place after December 1, 1992, plaintiffs also were responsible for furnishing the following documents within 77 days of closing: (1) a balance sheet, a statement of operations, retained earnings and cash-flow statements, and inventory assessments for the new fiscal year through the closing date ("closing-date documentation"); (2) a report from plaintiffs' independent accountant, KPMG Peat Marwick ("KPMG"), containing

<hr>

[1](...continued)
We use the name Ecclesiastes throughout this opinion to refer to this corporate entity, both before and after its name change.

[2]     DeLorean was the sole shareholder of Cristina, which was the sole shareholder of DeLorean Manufacturing, which was the sole shareholder of Ecclesiastes.

the results of its audit of this closing-date documentation; and (3) plaintiffs'
computation of the purchase-price adjustments based upon the audited closing-
date documentation. Thereafter, the parties would make arrangements for the
transaction's final payment.

DeLorean was plaintiffs' sole representative at the January 5, 1993 closing.
At closing, plaintiffs transferred their assets to LMC Holding, which, in response,
paid plaintiffs $4,900,000 in cash, provided them with a promissory note for
$850,000, and transferred to an escrow agent other notes and shares of preferred
stock. Seventy-seven days later, however, plaintiffs did not deliver to defendants
the closing-date documentation and their related calculation of the purchase-price
adjustments, as contemplated by the APA.

The closing-date documentation was never completed. Nevertheless,
DeLorean apparently attempted to negotiate the purchase-price adjustments with
defendants, offering a variety of seemingly contradictory methodologies and
calculations to conclude the agreement. Ultimately, defendants tendered no
additional payment.

**B.    Pleadings**

In January 1995, Ecclesiastes filed a complaint against LMC Holding and
Wallace. On March 24, 1995, an amended complaint was filed, and DeLorean,
DeLorean Manufacturing, and Cristina were added as plaintiffs. The amended
complaint named LMC Holding, LMC Operating Corporation ("LMC

Operating"),[3] LMC Tenant Corporation ("LMC Tenant"),[4] Lawrence Lopater,[5] and Wallace as defendants (collectively "defendants"). A second amended complaint was filed on December 15, 1995.

Plaintiffs brought claims for, *inter alia*, breach of contract, common law fraud, fraud-in-the-inducement, securities fraud, and violations of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961 *et seq*. Plaintiffs alleged that Wallace perpetrated a fraudulent scheme to induce DeLorean to enter into the APA. According to plaintiffs, defendants further perpetrated this scheme after the January 5, 1993 closing by impermissibly dissipating Ecclesiastes's assets to avoid satisfying defendants' financial obligations to plaintiffs, by demanding fraudulent offsets to the balance of the purchase price, and by preventing plaintiffs from accessing the business premises and the requisite records to calculate the purchase-price adjustments.

Plaintiffs' claims placed DeLorean at the center of the litigation. According to the second amended complaint, DeLorean negotiated the APA, misunderstood the terms of this purposefully "ambiguous and confusing" contract,

---

[3] LMC Operating is a wholly-owned subsidiary of LMC Holding; it was formed to assume ownership of and to operate the manufacturing business purchased by LMC Holding.

[4] LMC Tenant Corporation is a wholly-owned subsidiary of LMC Holding; it was formed to lease the real property of the manufacturing business purchased by LMC Holding and then to sublease the real property to LMC Operating.

[5] Lopater was an officer of LMC Holding, LMC Operating, and LMC Tenant.

was misled by the methodology for calculating the purchase-price adjustments, and personally participated in the "purported closing." App. at 40, 47.

In response, defendants filed an array of counterclaims, including claims for breach of contract, fraud-in-the-inducement, and negligent misrepresentation. Defendants asserted that DeLorean made several fraudulent representations to induce them to enter into the APA. Defendants specifically alleged the following: after closing, defendants discovered that Ecclesiastes's inventory of machines, parts, and supplies was both inadequate and obsolete; plaintiffs inflated the sales and revenue figures; Ecclesiastes's machines yielded significant undisclosed warranty liabilities due to defective design; and plaintiffs failed to make contributions to Ecclesiastes's pension plan and never discontinued its pension plan.

## C.    Discovery

DeLorean declared personal bankruptcy in September 1999. Approximately seven months later, LMC Operating filed for bankruptcy. On February 26, 2001, following these bankruptcy filings, the district court administratively closed the action. Little discovery had been completed at that point.

On November 4, 2002, plaintiffs moved to re-open the case and to dismiss the bankrupt parties. Plaintiffs filed a memorandum in support of this motion on July 10, 2003. On September 15, 2003, defendants filed a Rule 41(b) motion to

dismiss the action for failure to prosecute, arguing that plaintiffs inexcusably failed both to advance the litigation in the years prior to the administrative closure of the action and to proceed against the remaining defendants while the case against LMC Operating was stayed in accordance with bankruptcy law. On March 10, 2004, the district court granted plaintiffs' motion to re-open the case and to dismiss the bankrupt parties, including DeLorean. Despite denying defendants' motion to dismiss the action pursuant to Rule 41(b), the district court warned that sanctions may be appropriate upon proof of the loss of evidence, and orally directed the parties "to proceed in this case with all dispatch." App. at 1106.

On March 19, 2004, defendants served Ecclesiastes with a notice of deposition pursuant to Fed. R. Civ. P. 30(b)(6). The Rule 30(b)(6) notice identified April 20, 2004 as the date for the deposition of Ecclesiastes's corporate designee. Defendants sought to depose Ecclesiastes's corporate designee on a number of issues, including: the negotiation, content, execution, and performance of the APA; the preparation, accuracy, and GAAP-conformity of Ecclesiastes's financial statements between January 1, 1990 and January 5, 1995; communications between Ecclesiastes and Ecclesiastes's auditors/accountants between January 1, 1992 and the date of the deposition; the calculation of the purchase price; and the allegations in plaintiffs' second amended complaint and defendants' counterclaims. By the time defendants served their Rule 30(b)(6)

notice, ownership of Ecclesiastes had moved from DeLorean to his brother, Charles DeLorean, a creditor who acquired the interest in partial satisfaction of unpaid debts.

Shortly before the scheduled deposition, Ecclesiastes's counsel, Edgar Boles, asked defendants' counsel, Christopher Johnson, for a postponement. On May 6, 2004, defendants continued the deposition without scheduling a new date. Then, in a July 26, 2004 letter, Boles tendered three individuals for depositions, DeLorean and two former employees of Ecclesiastes, Bryce Patterson and Mel Mitchell. Boles did not expressly indicate whether the three were being designated as Rule 30(b)(6) deponents. The district court interpreted the July 26, 2004 letter as effecting the Rule 30(b)(6) designation of the three. In any event, in an October 15, 2004 letter, Boles left no room for doubt that the three were being provided "in response" to defendants' Rule 30(b)(6) notice.[6] App. at 546.

---

[6] At best, the record as a whole is ambiguous concerning whether Ecclesiastes intended for its July 26 letter to be a designation under Rule 30(b)(6), and whether defendants interpreted it as such. During oral argument, Ecclesiastes indicated that, in conversations with the defendants, it had put DeLorean forward as a Rule 30(b)(6) designee as early as April 2004 – that is, approximately one month after service of the Rule 30(b)(6) notice. We have found nothing in the record to support that assertion and, consequently, do not rely upon it. Ultimately, we need not determine whether there is sufficient evidence in the record to support the district court's finding that July 26, 2004, as opposed to October 15, 2004, marked the date of Ecclesiastes's Rule 30(b)(6) designation. Whether the correct date is July 26, 2004 or October 15, 2004, it remains true that: (1) despite being under the district court's directive to act with "all dispatch," Ecclesiastes delayed for *at least four months* before making Rule 30(b)(6) designations; and (2) after allowing *over eight months* to elapse from the time defendants initially served it with their Rule 30(b)(6) notice, Ecclesiastes

(continued...)

Between October 2004 and December 2, 2004, the parties engaged in discussions concerning the scheduling of depositions. The parties agreed to propose and confirm discovery dates prior to noticing depositions, due in part to the geographical distance between the parties and their respective counsel. Johnson sought without objection to depose DeLorean both in his personal and Rule 30(b)(6) capacities. Johnson sent approximately ten separate letters to Boles requesting that plaintiffs identify dates for the taking of depositions of Ecclesiastes's corporate designees, including DeLorean. Boles delayed in responding to defendants' requests, due in part to his absence from work for a family medical matter. On the three occasions when Boles did respond in writing, he never confirmed an exact date for DeLorean's deposition testimony.

Defendants took additional steps to secure DeLorean's testimony. On October 28, 2004, defendants moved to transfer venue to the United States District Court for the Southern District of New York. Defendants requested the change in venue to ensure that, if necessary, they could subpoena DeLorean's presence at trial pursuant to Fed. R. Civ. P. 45(b)(2). Defendants labeled DeLorean as "probably the single most critical witness in this case." App. at 403.

On November 8, 2004, Boles withdrew Ecclesiastes's designation of two of its Rule 30(b)(6) deponents, Peterson and Mitchell, asserting that as former

[6](...continued)
inexplicably withdrew its most logical – indeed, irreplaceable – Rule 30(b)(6) witness, DeLorean. As discussed further below, it is factors such as these that control the resolution of this appeal.

-9-

employees they could not serve as designees. On December 2, 2004, one day after receiving Johnson's tenth letter requesting a date for DeLorean's Rule 30(b)(6) deposition, Boles withdrew DeLorean's name, stating that he "cannot formally designate any witness under Rule 30(b)(6) or otherwise for, among other reasons, all such persons are third-party witnesses . . . . [and] none are under the direction and control of my client." App. at 585.

Defendants quickly filed a motion to compel and requested the costs of the motion as a sanction. Opposing defendants' motion to compel, Ecclesiastes argued that potential Rule 30(b)(6) witnesses "could not be compelled to appear and indeed, could not be 'designated[]' [because] [a]ll were third parties who were former employees." App. at 707. In contrast to this representation, Boles filed an affidavit stating that DeLorean is the "only remaining officer or director" of Ecclesiastes, and, as Ecclesiastes's sole representative at the time of the APA's execution, the only witness who could testify as to some of the subject areas in defendants' Rule 30(b)(6) notice. App. at 724.

On January 25, 2005, the district court held a hearing on the motion to transfer venue. Ecclesiastes's local counsel, Reid Lambert, agreed that DeLorean was vital to plaintiffs' claims, stating: "[A]s counsel accurately points out, Mr. DeLorean is essential to our case. It would be silly to think we could put on our case without him." App. at 1046. In addition, Lambert represented that because

DeLorean was still a corporate officer of Ecclesiastes, the district court would possess the authority to command his appearance at a trial in Utah:

> Mr. DeLorean is still affiliated with Ecclesiastes. I suppose it would be practicable for this Court under those circumstances to direct Ecclesiastes to default if they didn't produce him . . . .
>
>    . . . .
>
> You know, I guess what I'm suggesting is this . . . . *I think in this case it is practical for this Court to say* Mr. DeLorean is an officer of your company, if you don't produce him—you know, you are the company, you are the officers, you're the director, I guess you would say, *if you don't produce him, I'm going to default you.*

App. at 1044-45 (emphasis added).

The district court found that DeLorean's presence at trial was "absolutely essential[]," but held its ruling on the motion to transfer in abeyance pending consideration of whether DeLorean's presence could be guaranteed. App. at 1049, 1052-53. On February 3, 2005, Ecclesiastes filed a statement with the district court agreeing that if DeLorean "fails to appear in person as a witness at trial, absent compelling health-related reasons satisfactory to the Court, the Court may dismiss Ecclesiastes' claims with prejudice." App. at 796. Defendants objected to this statement, contending that Ecclesiastes knew of DeLorean's advanced age and poor health for several years and should therefore "bear any and all risks if Mr. DeLorean is unable to attend the trial **for whatever reason**." App. at 801.

-11-

On March 19, 2005, DeLorean died. Defendants renewed their Rule 41(b) motion to dismiss for failure to prosecute and advised the district court that their pending motion to transfer venue was moot. The district court admonished Ecclesiastes's counsel to take the motion "serious[ly]." App. at 982. On May 24, 2005, following oral argument, the district court granted defendants' motion and dismissed the entire action with prejudice as to all plaintiffs. This ruling was later embodied in a written order, dated June 15, 2005. The district court acknowledged that dismissal should be a measure of last resort, but reasoned that the five-factor test of *Ehrenhaus v. Reynolds*, 965 F.2d 916 (10th Cir. 1992), mandated this outcome. Only Ecclesiastes appeals the judgment.

## II.    DISCUSSION

This Court has jurisdiction under 28 U.S.C. § 1291 to review the district court's order of dismissal pursuant to Rule 41(b). Ecclesiastes asserts that the district court erred in two ways. First, Ecclesiastes argues that the district court wrongly applied Rule 41(b) to a discovery dispute that falls exclusively within the ambit of Fed. R. Civ. P. 37. Second, Ecclesiastes argues that, even if Rule 41(b) is applicable, the district court failed to apply correctly the factors for involuntary dismissal.

## A.    Applicability of Rule 41(b)

Ecclesiastes argues that the district court committed a fundamental error by using Rule 41(b) to dismiss the action under a failure-to-prosecute theory. Relying upon *Societe Internationale Pour Participations Industrielles Et Commerciales, S.A. v. Rogers*, 357 U.S. 197, 207 (1958), Ecclesiastes contends that, due to the extreme consequences of dismissal, disputes regarding the production of discovery must be exclusively resolved under Rule 37.  Because Ecclesiastes never violated an order "to provide or permit discovery" within the meaning of Rule 37(b)(2),[7] it reasons that the district court lacked authorization to dismiss the action.[8]

---

[7]    In pertinent part, Rule 37(b)(2) reads as follows:

> If a party or an officer, director, or managing agent of a party or a person designated under Rule 30(b)(6) or 31(a) to testify on behalf of a party fails to obey *an order to provide or permit discovery* . . . the court in which the action is pending may make such orders in regard to the failure as are just, and among others the following:
>     . . . .
>
> (C) *An order . . . dismissing the action or proceeding*, or any part thereof, or rendering a judgment by default against the disobedient party[.]

Fed. R. Civ. P. 37(b)(2) (emphasis added).

[8]    Inherent in Ecclesiastes's argument is the contention that the district court should have resolved defendants' arguments under the framework of Rule 37(a), which permits a motion to compel upon a failure "to make a designation under Rule 30(b)(6)," and which prescribes the sanction of reasonable expenses, but *not* dismissal, upon the granting of a Rule 37(a) motion.  Fed. R. Civ. P. 37(a)(2)(B), (a)(4); *see, e.g.*, Aplt. Reply Br. at 2-3 ("Ecclesiastes contends that the entire issue . . . should have been addressed as a discovery dispute pursuant to Fed. R.

(continued...)

In response, defendants argue that Ecclesiastes forfeited this argument by failing to raise it before the trial court. We agree.

An issue is preserved for appeal if a party alerts the district court to the issue and seeks a ruling. *See, e.g., Century 21 Real Estate Corp. v. Meraj Int'l Inv. Corp.*, 315 F.3d 1271, 1278 (10th Cir. 2003). This Court will not consider a new theory advanced for the first time as an appellate issue, even a theory that is related to one that was presented to the district court. *See, e.g., Hiner v. Deere & Co.*, 340 F.3d 1190, 1196 (10th Cir. 2003). Nor does the "vague and ambiguous" presentation of a theory before the trial court preserve that theory as an appellate issue. *Okland Oil Co. v. Conoco, Inc.*, 144 F.3d 1308, 1314 n.4 (10th Cir. 1998); *see Tele-Communications, Inc. v. Comm'r of Internal Revenue*, 104 F.3d 1229, 1233 (10th Cir. 1997) ("[T]o preserve the integrity of the appellate structure, we should not be considered a 'second shot' forum . . . where secondary, back-up theories may be mounted for the first time.").

Ecclesiastes did not preserve this issue for appeal. Although Ecclesiastes claims that the question of "whether the case should be dismissed under Rule 41(b) . . . was the whole focus of the matter in the district court," Aplt. Reply Br. at 15, there is a palpable distinction between challenging the correctness of the district court's Rule 41(b) analysis and challenging the applicability of Rule 41(b) itself. *Cf. Lyons v. Jefferson Bank & Trust*, 994 F.2d 716, 721-22 (10th Cir.

---

[8](...continued)
Civ. P. 37. Since the sanction of dismissal would not have been available thereunder, dismissal was inappropriate and the matter should be reversed.").

1993) (raising of related theory before district court insufficient to preserve issue for appeal). The district court never addressed the latter issue – *i.e.,* the applicability *vel non* of Rule 41(b) – in its May 24, 2005 ruling or in its June 20, 2005 opinion. Ecclesiastes's appellate briefs, moreover, do not identify a place in the record where Ecclesiastes or any other plaintiff argued that Rule 41(b) is inapposite. *See* 10th Cir. R. 28.2(C)(2) ("For each issue raised on appeal, all briefs must cite the precise reference in the record where the issue was raised and ruled on."); *see also State Ins. Fund v. Ace Transp. Inc.*, 195 F.3d 561, 565 n.3 (10th Cir. 1999) (refusing to consider argument when appellant fails to show where in record issue was raised and resolved).

Ecclesiastes conceded at oral argument that this issue was not raised with specificity before the district court. Ecclesiastes nonetheless identified pages in the record where this contention allegedly was raised by implication. *See* App. at 878, 1007-08, 1016-17. Our review of those pages, however, fails to confirm Ecclesiastes's representation. For the most part, Ecclesiastes simply argued that it was improper for the district court to dismiss plaintiffs' action on any ground other than the substantive merits. *E.g., id.* at 1016-17 ("[I]f the case is going to be dismissed because John DeLorean died, it ought to be dismissed because substantively the case can't be proven without Mr. DeLorean present.").

Ecclesiastes also invoked at oral argument the "plain error" doctrine. Yet, this doctrine provides no aid. Although the "plain error" doctrine is typically

applied in the civil context to address trial-related errors, *see* Fed. R. Civ. P. 51(d)(2) and Fed. R. Evid. 103(d), we have performed a plain-error analysis in civil litigation to address alleged pre-trial errors. *See Employers Reinsurance Corp. v. Mid-Continent Cas. Co.*, 358 F.3d 757, 769-70 (10th Cir. 2004) (applying "plain error" analysis to alleged error in resolution of summary judgment motions).

However, like the plaintiff in *Employers Reinsurance Corp.*, Ecclesiastes has failed in seeking plain-error review to carry its "nearly insurmountable burden." *Quigley v. Rosenthal*, 327 F.3d 1044, 1063 (10th Cir. 2003) (internal quotation marks omitted). The use of the failure-to-prosecute component of Rule 41(b), rather than Rule 37(a), was not plainly erroneous, based upon the history of this litigation and the district court's inventory of the myriad forms of Ecclesiastes's dilatory behavior following the recommencement of discovery on March 10, 2004.[9] *Cf. Rogers*, 357 U.S. at 207-08 (holding that Rule 37 is the exclusive mechanism for dismissal of complaint due to singular issue of noncompliance with order requiring production of discovery).

---

[9] Ecclesiastes's argument misinterprets the scope of the factual basis for the district court's use of Rule 41(b). The district court did not expressly rest its decision on Ecclesiastes's failure to comply with a discovery order. Nor did the district court rest its failure-to-prosecute finding *solely* upon Ecclesiastes's failure to make a corporate designation under Rule 30(b)(6), conduct which would fall under the province of Rule 37(a). Instead, as discussed *infra*, the district court found that a Rule 41(b) dismissal was appropriate because Ecclesiastes willfully engaged in a process of delay that resulted in the loss of vital Rule 30(b)(6) testimony.

Furthermore, assuming *arguendo* that there was error, this error certainly did not result in a miscarriage of justice that seriously affected "the fairness, integrity or public reputation of judicial proceedings." *Sloan v. State Farm Mut. Auto. Ins. Co.*, 360 F.3d 1220, 1226 (10th Cir. 2004); *see Employers Reinsurance Corp.*, 358 F.3d at 770. Significantly, the same test that district courts employ in our circuit in considering motions for dismissal under Rule 41(b) – the *Ehrenhaus* test – could have been used by the district court here to dismiss the action under its inherent authority, without regard to the availability of a Rule 37 sanction. *Chavez v. City of Albuquerque*, 402 F.3d 1039, 1043-44 (10th Cir. 2005) (*Ehrenhaus* dismissal analysis applies when district court invokes inherent power to dismiss jury verdict due to plaintiff's perjury at trial); *see Chambers v. NASCO, Inc.*, 501 U.S. 32, 49 (1991) (noting that "inherent power of a court can be invoked even if procedural rules exist which sanction the same conduct"). Consequently, we would be hard pressed to conclude that the district court's invocation of *Ehrenhaus* under the Rule 41(b) framework resulted in a miscarriage of justice and rendered its dismissal of the case fundamentally unfair.

**B.     Appropriateness of Dismissal**

This Court reviews for an abuse of discretion a district court's decision to dismiss an action for failure to prosecute. *E.g.*, *Nasious v. Two Unknown B.I.C.E. Agents*, No. 07-1105, __ F.3d __, 2007 WL 1895877, at * 2 (10th Cir. July 3, 2007) ("We review dismissals under Rule 41(b) for abuse of discretion."); *see Gripe v. City of Enid, Okla.*, 312 F.3d 1184, 1188 (10th Cir. 2002). An abuse of discretion occurs when a district court makes "a clear error of judgment or exceed[s] the bounds of permissible choice in the circumstances." *McEwen v. City of Norman, Okla.*, 926 F.2d 1539, 1553-54 (10th Cir. 1991). This occurs when a district court relies upon an erroneous conclusion of law or upon clearly erroneous findings of fact. *See Ashby v. McKenna*, 331 F.3d 1148, 1149 (10th Cir. 2003). Applying this deferential standard, we affirm the district court's dismissal order.

Rule 41(b) states, "For failure of the plaintiff to prosecute or to comply with these rules or any order of court, a defendant may move for dismissal of an action or of any claim against the defendant." Fed. R. Civ. P. 41(b). The sanction of dismissal with prejudice for failure to prosecute is a "severe sanction," a measure of last resort. *Jones v. Thompson*, 996 F.2d 261, 265 (10th Cir. 1993); *see Meade v. Grubbs*, 841 F.2d 1512, 1521 n.7 (10th Cir. 1988).

We have identified a non-exhaustive list of factors that a district court ordinarily should consider in determining whether to dismiss an action with

prejudice under Rule 41(b): (1) the degree of actual prejudice to the other party; (2) the amount of interference with the judicial process; (3) the litigant's culpability; (4) whether the court warned the party in advance that dismissal would be a likely sanction for noncompliance; and (5) the efficacy of lesser sanctions.[10] *Ehrenhaus*, 965 F.2d at 921; *see Mobley v. McCormick*, 40 F.3d 337, 341 (10th Cir. 1993) ("Rule 41(b) involuntary dismissals should be determined by reference to the *Ehrenhaus* criteria."). Under this flexible framework, established in our *Ehrenhaus* decision, dismissal is warranted when "the aggravating factors outweigh the judicial system's strong predisposition to resolve cases on their merits." *Ehrenhaus*, 965 F.2d at 921 (internal quotation marks omitted; quoting *Meade*, 841 F.2d at 1521 n.7).

Ecclesiastes concedes that the district court addressed each factor of the *Ehrenhaus* test. Ecclesiastes nonetheless challenges the correctness of the district court's application of each factor and, hence, its ultimate conclusion.

### 1.  Degree of Actual Prejudice

The district court found that the loss of DeLorean's deposition testimony – the product of Ecclesiastes's dilatoriness – actually prejudiced defendants. The district court reasoned that the content and credibility of DeLorean's testimony

---

[10]  By contrast, a district court need not follow "any particular procedures" when dismissing an action without prejudice under Rule 41(b). *Nasious*, __ F.3d __, 2007 WL 1895877, at *2. Only a dismissal with prejudice triggers the *Ehrenhaus* criteria because it is "a significantly harsher remedy – the death penalty of pleading punishments." *Id.*

was essential to Ecclesiastes's claims and defendants' defense of those claims, and also to defendants' counterclaims. The district court noted, moreover, that both parties recognized the critical value of this testimony.

Ecclesiastes contests this finding, arguing that DeLorean's death only injured the likelihood of success of plaintiffs' claims. In fact, Ecclesiastes reasons that DeLorean's death inured to defendants' benefit, relieving defendants of the task of impeaching his credibility or rebutting his statements at trial. According to Ecclesiastes, the extent of defendants' loss was the "opportunity to conduct what they hoped would be a successful cross examination of Ecclesiastes' primary witness." Aplt. Br. at 20.

We agree with the district court's analysis. Ecclesiastes's position overlooks the crucial function of the discovery process. For instance, defendants were entitled to investigate the merits of the DeLorean-specific allegations in plaintiffs' complaint. According to these averments, DeLorean possessed information concerning, *inter alia*, the negotiation of the APA, the meaning of allegedly ambiguous provisions in the APA,[11] the defendants' allegedly fraudulent

---

[11] As the district court properly perceived, defendants were entitled to explore DeLorean's and Ecclesiastes's understanding of the meaning of these allegedly "ambiguous" passages, even though the district court might have found later that the APA is unambiguous and, through application of the parol evidence rule, excluded such testimony at trial. *See* Fed. R. Civ. P. 26(b) (parties may obtain discovery of any non-privileged matter "relevant to the claim or defense of any party," which covers any request "reasonably calculated to lead to the discovery of admissible evidence"). Furthermore, contrary to Ecclesiastes's assertions, the presence of an integration clause in the APA would not *per se* exclude DeLorean's testimony as to the APA's meaning if portions of the APA were

(continued...)

-20-

statements, and the extent of Ecclesiastes's compliance with its post-closing obligations.

In fact, as the district court noted, DeLorean was "alleged to have been the only negotiator of [the] transaction on behalf of the corporate plaintiffs and the recipient on their behalf of the alleged fraudulent statements delivered by defendants." App. at 930. The loss of DeLorean's deposition testimony prevented defendants from fashioning an effective defense to Ecclesiastes's fraud-related and contract-related claims.

Similarly, defendants had considerable need to explore, through DeLorean, Ecclesiastes's knowledge of facts relevant to defendants' counterclaims. For instance, defendants filed breach of contract, negligent misrepresentation, and fraud-in-the-inducement counterclaims. To establish these claims, defendants needed to depose DeLorean. The topics of particular significance to them, as to these counterclaims, included: (1) DeLorean's pre-transaction representations; (2) DeLorean's notes and correspondence regarding the execution of the APA; (3) the unexpected and arguably suspicious emergence of corporate documents purporting to show that the pension plan was terminated in 1988; (4) DeLorean's preparation of arguably conflicting calculations of the purchase-price

---

[11](...continued)
found to be ambiguous. *See, e.g.*, *Proteus Books Ltd. v. Cherry Lane Music Co., Inc.*, 873 F.2d 502, 509-10 (2d Cir. 1989) (applying New York law); *Kimball v. Campbell*, 699 P.2d 714, 716 (Utah 1985) (applying Utah law).

adjustments; and (5) Delorean's post-closing correspondence with Ecclesiastes's accountants.

Indeed, Ecclesiastes asserted that DeLorean was the "only person" with information relevant to certain subjects in defendants' Rule 30(b)(6) notice. Its failure to permit DeLorean's knowledge to be memorialized prior to his death consequently deprived defendants of the ability to gather facts essential to the success of their counterclaims against Ecclesiastes.

This prejudice is further confirmed by the parties' express recognition of DeLorean's integral role in this litigation. In order to secure DeLorean's attendance at trial, defendants filed a motion to transfer venue to the Southern District of New York, labeling DeLorean as "probably the single most critical witness in this case." App. at 403. In defending against this motion, Ecclesiastes conceded not only that DeLorean's testimony was "essential" to its case, but also that "[i]t would be silly to think we could put on our case without him."[12] App. at

_____

[12] Ecclesiastes argues that Lambert, its local counsel, had no authority to speak on behalf of Ecclesiastes at the motion to transfer venue hearing, and that Lambert "conceded at the time" that he lacked the authority. Aplt. Reply Br. at 9. Ecclesiastes's record citations, however, do not evince Lambert's purported concession. And there is certainly "nothing novel" about holding clients responsible for the conduct of their attorneys, even conduct they did not know about. *See, e.g.*, *Gripe*, 312 F.3d at 1188-89 (affirming dismissal under Rule 41(b) without direct evidence of plaintiffs' knowledge of attorney's derelictions because litigant bound by actions of attorney). *Cf. Link v. Wabash R.R. Co.*, 370 U.S. 626, 633, 634 & n.10 (1962) (affirming dismissal under trial court's inherent authority for attorney's misconduct, including unexplained absence from pretrial conference; observing that plaintiff "voluntarily chose this attorney as his representative in the action, and he cannot now avoid the consequences of the acts or omissions of this freely selected agent").

(continued...)

1046. Furthermore, the district court acknowledged the indispensability of DeLorean's testimony, going so far as to command plaintiffs to file a statement guaranteeing that, "absent legitimate health reasons," Ecclesiastes would produce DeLorean at trial. App. at 1050.

In sum, even if DeLorean's testimony would not have facilitated the success of defendants' defenses and counterclaims, defendants lost forever the opportunity to make that determination. At least equally as important, they lost an opportunity to gain relevant information as to Ecclesiastes's perception of the factual basis of the parties' claims. Under the standards of our caselaw, defendants clearly suffered prejudice. *See Gripe*, 312 F.3d at 1188 (concluding that district court rested its dismissal order on "appropriate considerations" under *Ehrenhaus* test when it found "on at least two occasions that plaintiff's failure to follow court orders and rules had inconvenienced and prejudiced defendants and the court"); *Jones*, 996 F.2d at 264 (using *Ehrenhaus* test and noting that, due to plaintiffs' discovery non-compliance, "Defendants suffered prejudice in preparing for trial without the opportunity to depose the Plaintiffs").

## 2. Degree of Interference

---

[12](...continued)

Nor did the district court misinterpret Ecclesiastes's admission. The entire statement reads as follows: "I will offer it as a solution because, as [defense] counsel accurately points out, Mr. DeLorean is essential to our case. It would be silly to think we could put on our case without him." App. at 1046.

The district court itemized Ecclesiastes's unilateral, discovery-related misconduct. The district court found this misconduct to be "willful" and aimed, at least in significant part, at "avoid[ing] having Mr. DeLorean deposed as Ecclesiastes's corporate representative." App. at 934. It ultimately ruled that Ecclesiastes's misconduct interfered with its process. *Id.*

Ecclesiastes responds that it was engaged in "a legitimate, good faith dispute" over the propriety of defendants' invocation of Rule 30(b)(6) and that such a dispute "does not equate to interference with judicial process." Aplt. Br. at 22. We reject Ecclesiastes's position.

As an initial matter, Ecclesiastes's dilatoriness during the discovery process went beyond a mere "discovery dispute" over whether Ecclesiastes was required to designate Rule 30(b)(6) representatives. The district court thoroughly documented the litany of dilatory conduct: Ecclesiastes's failure to designate corporate representatives until at least *four months after* defendants' Rule 30(b)(6) notice; Ecclesiastes's failure to communicate in a timely and responsive fashion with defendants during the discovery period; Ecclesiastes's failure to produce DeLorean for a Rule 30(b)(6) deposition, even after designating him, despite repeated written attempts by defendants' counsel to secure an exact date for his deposition; and Ecclesiastes's sudden and "inexplicabl[e]" withdrawal of DeLorean as a Rule 30(b)(6) designee. App. at 934; *see id.* at 933. This behavior clearly violated the district court's mandate to proceed with "all dispatch." App.

at 1106.  And, consequently, we cannot conclude that the district court erred in finding that Ecclesiastes interfered with its process.  *See*, *e.g.*, *Archibeque v. Atchison, Topeka and Santa Fe Ry. Co.*, 70 F.3d 1172, 1174-75 (10th Cir. 1995) (upholding district court's finding that plaintiff's willful failure to disclose requested information during discovery amounted to a serious interference with the judicial process).

Furthermore, Ecclesiastes's contention that it operated under a good-faith belief that it could decline to make Rule 30(b)(6) designations because it lacked control of potential designees strains credulity.  The law is well-settled that corporations have an "affirmative duty" to make available as many persons as necessary to give "complete, knowledgeable, and binding answers" on the corporation's behalf.  *Reilly v. Natwest Mkt. Group Inc.*, 181 F.3d 253, 268 (2d Cir. 1999) (internal quotation marks omitted; quoting *Sec. & Exch. Comm'n v. Morelli,* 143 F.R.D. 42, 45 (S.D.N.Y. 1992)); *see* Fed. R. Civ. P. 30(b)(6) ("organization so named *shall* designate one or more officers, directors, or managing agents, or other persons who consent to testify on its behalf" (emphasis added)).

This duty is not negated by a corporation's alleged lack of control over potential Rule 30(b)(6) deponents.  *See Resolution Trust Corp. v. S. Union Co., Inc.*, 985 F.2d 196, 197 (5th Cir. 1993) (noting that Rule 30(b)(6) places the burden of identifying responsive witness for corporate deposition on corporation);

-25-

Roger Fendrich and Kent Sinclair, *Discovering Corporate Knowledge and Contentions*, 50 Ala. L. Rev. 651, 665 (1999) (noting that "[a]ny witness who can gather responsive information may be designated by the company" and that, in "one common scenario," corporations designate individuals who "lack[] personal knowledge" of the events giving rise to the litigation but who have otherwise been educated about it).[13]

We also note that, insofar as lack of control is a consideration in the operation of Rule 30(b)(6), this absence of control is not established by an individual's status as a corporate officer or director. *See* Fed. R. Civ. P. 30(b)(6) & advisory committee's note, 1970 amendment (evincing that "officers, directors, or managing agents" are typical Rule 30(b)(6) designees and others may be designated "but only with their consent"). Indeed, the 1970 amendments to Rule 30 expressly removed the previous distinction between directors, on one hand,

_____

[13]    Ecclesiastes relies primarily upon the Fendrich and Sinclair law review article to support its legal position. (Aplt. Br. at 22-25.) The article offers, however, no meaningful assistance. While highlighting the many ways in which civil plaintiffs may abuse the Rule 30(b)(6) process, the article emphasizes that a "corporation is obligated to comply" with a Rule 30(b)(6) notice, even though it need not designate a former employee. *Id*. at 664; *see id*. at 654-57, 665. It further notes that "the view that the duty to educate a person with no prior knowledge is 'prejudicial' to a corporation has not prevailed, and it appears now to be recognized that the Rule 30(b)(6) deponent must be woodshedded with information that was never known to the witness prior to deposition preparation." *Id*. at 689-90 (footnotes omitted); *see id*. at 687 ("Using the discovering party's roster of desired information as a guide, the entity is expected to *create* a witness with responsive knowledge."). Therefore, even Ecclesiastes's own authority reveals that, under the facts of this case, Ecclesiastes was required to produce a knowledgeable deponent, whether DeLorean or a third-party educated by Ecclesiastes on relevant matters.

and managing agents and officers, on the other; a corporation now is *deemed* to have legal control over its directors, like its managing agents and officers, for deposition purposes. *Id*.; *see also* 8A Charles Alan Wright, Arthur R. Miller, Richard L. Marcus, *Federal Practice & Procedure* § 2103, at 37-39 (1994) (discussing the effects of the complimentary 1970 amendments to Rule 30(b) and Rule 37(d) that, respectively, rejected the notion that a corporation lacks "power over its directors," and, therefore, mandated that a "corporation is *responsible* for producing its . . . directors if notice is given" (emphasis added)). The text and history of Rule 30(b)(6) clearly defeat Ecclesiastes's contention that DeLorean's status as only "an officer or director on paper" had the effect of eliminating its legal control over him. Aplt. Reply Br. at 6. Accordingly, Ecclesiastes cannot reasonably predicate its purported good-faith belief on this theory.

To show good faith, Ecclesiastes had to promptly respond in *some* fashion to defendants' Rule 30(b)(6) notice. Ecclesiastes could have promptly informed defendants of its alleged concerns about the propriety of their Rule 30(b)(6) notice. Or Ecclesiastes could have explained its purported inability to provide information responsive to the notice. Then, failing a negotiated resolution with defendants, Ecclesiastes could have sought a protective order from the district court. *See EEOC v. Thurston Motor Lines, Inc.*, 124 F.R.D. 110, 114 (M.D. N.C. 1989) (imposing Rule 37 sanctions on successor to corporate party served with Rule 30(b)(6) notice because successor "had absolutely no right . . . to refuse to

designate a witness. If it had an objection to discovery, its opportunity was to request a protective order . . . ."). *Cf.* Fed. R. Civ. P. 30(b)(6) advisory committee's note, 1970 amendments (noting availability of protective orders to curb possible excesses in corporate discovery practices and specifically stating that "a court's decision whether to issue a protective order may take account of the availability and use made of the procedures provided in this subdivision"). Yet, the record reveals no sign that Ecclesiastes followed this or a similarly responsive path.

Instead, Ecclesiastes delayed for at least four months – without noting any legal objections – before it offered a roster of Rule 30(b)(6) witnesses, including DeLorean. Then, Ecclesiastes allowed weeks to elapse before it withdrew these witnesses. In particular, it allowed a considerable period to pass before it withdrew the unquestionably most important Rule 30(b)(6) witness, DeLorean. Significantly, these withdrawal decisions were not based upon newly-emergent facts or circumstances. Rather, Ecclesiastes withdrew its designees based upon concerns regarding their alleged third-party status – concerns that should have been apparent to Ecclesiastes when defendants first issued their Rule 30(b)(6) notice in March 2004.

Therefore, we reject Ecclesiastes's argument that the district court erred in basing its interference finding on Ecclesiastes's alleged good-faith dispute over Rule 30(b)(6) discovery. Put simply, Ecclesiastes's conduct involved more than a

simple discovery dispute over Rule 30(b)(6) designations, and we cannot conclude that Ecclesiastes acted in good faith.

### 3. Culpability of Ecclesiastes

The district court found that, as a consequence of Ecclesiastes's "willful effort" to avoid DeLorean's Rule 30(b)(6) deposition, his "critical testimony" was not preserved. App. at 994. Ecclesiastes contests this finding, arguing that it was not required to designate DeLorean as its corporate designee because he was not within its control, and that it offered to arrange deposition dates for DeLorean in his personal capacity on multiple occasions.

Ecclesiastes's protestations ring hollow. As indicated above, Ecclesiastes's lack-of-control argument rests on a dubious legal foundation. Furthermore, irrespective of whether Ecclesiastes was required to designate DeLorean, it *did* designate DeLorean.[14] Inexplicably, it waited at least four months to do so.

Ecclesiastes must have understood DeLorean's central role in the negotiation and closing of the APA. Indeed, during the course of the litigation, Ecclesiastes conceded that DeLorean was Ecclesiastes's sole remaining officer and director, and the only individual who could address certain topics in

---

[14] It is somewhat odd that Ecclesiastes's arguments appear to erroneously assume that it never designated DeLorean under Rule 30(b)(6). *See* Aplt. Br. at 30 ("The reason that DeLorean was not deposed earlier was due entirely to the fact that Defendants' counsel would not proceed *unless* and until Ecclesiastes made a 30(b)(6) designation . . . . Ecclesiastes resisted this ultimatum . . . ." (emphasis added)).

defendants' Rule 30(b)(6) notice. Accordingly, DeLorean should have been front and center for Ecclesiastes as a Rule 30(b)(6) designee.

Then, after it finally designated DeLorean, Ecclesiastes willfully and unreasonably failed to communicate with defendants to nail down deposition dates for him and the other Rule 30(b)(6) witnesses. During all of this time, moreover, Ecclesiastes was well aware of DeLorean's advanced age and fragile health. Even more egregiously, Ecclesiastes chose to withdraw its Rule 30(b)(6) designation eight months after being served with defendants' Rule 30(b)(6) notice, which necessarily implicated DeLorean's testimony. Reciting this litany of Ecclesiastes's willful misconduct supplies the answer to the question before us: that is, the district court did not err in finding under our *Ehrenhaus* analysis that Ecclesiastes was culpable.

It is true that Ecclesiastes expressed a willingness to make arrangements for defendants to depose DeLorean solely in his personal capacity. This fact, however, is beside the point. DeLorean was uniquely situated to respond to certain inquires raised in defendants' Rule 30(b)(6) notice. In the absence of a court ruling to the contrary, defendants were legally entitled to answers to those inquiries. Ecclesiastes's presentation of DeLorean for a deposition solely in his personal capacity could not have satisfied defendants' evidentiary needs. And, with DeLorean's death, these needs will never be satisfied.

## 4. Advance Notice of Sanction of Dismissal

The district court found that Ecclesiastes had "constructive notice" of the possibility of dismissal for future delays. The district court inferred constructive notice from the following events: its consideration of defendants' first Rule 41(b) motion to dismiss; its March 10, 2004 mandate that the parties proceed with "all dispatch"; Ecclesiastes's necessary recognition of the imperative of promptly conducting DeLorean's deposition as a corporate representative, due to DeLorean's age, health, and inimitable capacity to satisfy the inquiries of defendants' Rule 30(b)(6) notice; defendants' motion to compel and its accurate recitation of Ecclesiastes's Rule 30(b)(6) obligations; and the court's warning at the January 2005 hearing on defendants' motion to transfer that if DeLorean "was not made available at trial, barring impossibility, the Court would dismiss plaintiffs' claims against defendants." App. at 935-36.

Ecclesiastes's primary argument on appeal is that this prong cannot be satisfied without a specific warning by the district court of the possibility of dismissal in the event of the commission of identified misconduct. Under this formulation, constructive notice, as a matter of law, does not satisfy the notice prong of the *Ehrenhaus* test. Ecclesiastes further argues that, even if constructive notice is legally sufficient, the notice in this instance was inadequate because it did not occur in connection with the conduct forming the basis for the dismissal.

At the outset, we must point out that notice is not a prerequisite for dismissal under *Ehrenhaus*. *See Archibeque*, 70 F.3d at 1175 (affirming dismissal pursuant to *Ehrenhaus* test despite absence of warning as to imminent dismissal). *Cf. Link*, 370 U.S. at 632 (upholding dismissal predicated upon trial court's inherent authority and stating that "absence of notice as to the possibility of dismissal . . . [does not] necessarily render such a dismissal void"). Nonetheless, because notice is an important element in the *Ehrenhaus* analysis, we address Ecclesiastes's challenge.

Frequently, when we have concluded that *Ehrenhaus*'s notice prong has been met, the trial court has indeed expressly identified dismissal as a likely sanction. *See Gripe*, 312 F.3d at 1188; *Jones*, 996 F.2d at 265. However, we have never declared this form of express notice to be the *minimum* standard for satisfaction of the notice prong. In fact, we have applied a less exacting standard. For instance, in *Ehrenhaus* itself, we concluded that an oral warning to "*expect* a motion from the defendants that [the] case be dismissed for failure to cooperate in discovery," if plaintiff failed to attend a continued deposition, "put Ehrenhaus [plaintiff] on notice that failure to comply" would subject his claims to dismissal. *Ehrenhaus*, 965 F.2d at 921 (emphasis added).

The district court in *Ehrenhaus* did not promise to dismiss the action in the event of plaintiff's failure to cooperate. Nor did it even assert that dismissal would be the likely judicial sanction for such a failure. It simply indicated that

-32-

dismissal would become an issue if plaintiff failed to cooperate, and that it would entertain a motion seeking such relief. Therefore, constructive notice – that is, notice (1) without an express warning and (2) objectively based upon the totality of the circumstances (most importantly, the trial court's actions or words) – was precisely the kind of notice that we considered in *Ehrenhaus* and deemed to be sufficient. Ecclesiastes's attempt to map an express-warning requirement onto *Ehrenhaus's* notice prong is therefore fatally undercut by the facts of *Ehrenhaus* itself.

Further, we note that Ecclesiastes has failed to cite binding or persuasive caselaw holding that constructive notice is legally insufficient to satisfy *Ehrenhaus's* notice prong. In fact, the lone case upon which Ecclesiastes relies, *Salahuddin v. Harris*, 782 F.2d 1127 (2d Cir. 1986), is inapposite: the Second Circuit did not reject the concept of constructive notice in a Rule 41(b) context, but, instead, refused to imply the existence of a discovery order to support the district court's sanction of dismissal under Rule 37(b). *See Harris*, 782 F.2d at 1132.

Applying this constructive notice methodology, we affirm the district court's finding. Ecclesiastes was warned of the possibility of dismissal when the district court denied defendants' first motion to dismiss for lack of prosecution. And the district court stated that, if plaintiffs are to blame for the loss of evidence, it "will be able to apply sanctions on an issue-by-issue, evidence-by-

evidence basis." App. at 1106. The district court further warned the parties to proceed "with all dispatch." *Id.*

Like *Ehrenhaus*, it is true that the district court here never *promised* to dismiss the case in the event of dilatoriness or evidentiary losses. But it certainly left open, if not highlighted, such a possibility. In fact, Ecclesiastes recognized the likelihood of this outcome when its counsel declared, in opposition to defendants' motion to transfer venue, that it would be "practicable" for the district court to default Ecclesiastes if it failed to produce DeLorean, based upon the importance of DeLorean's testimony to its claims. App. at 1044.

Ecclesiastes's contention that the district court's constructive notice was inadequate because it did not occur in relation to the conduct forming the basis for the dismissal is misguided. It is premised upon the notion that the conduct at issue was solely Ecclesiastes's purported good-faith resistance to designating witnesses under Rule 30(b)(6). *See* Aplt. Br. at 28 (acknowledging district court's reference to "all dispatch" notice, and stating that "[t]he remaining 'notices' arose in December of 2004 and January of 2005, *after* the 30(b)(6) dispute had already become the subject of a Motion to Compel. In opposing the 30(b)(6) notice, Ecclesiastes could not have anticipated that DeLorean would die, or that his death would be grounds for dismissal." (emphasis added)). However, as discussed above, Ecclesiastes's willful misconduct went beyond a simple

-34-

dispute over the designation of Rule 30(b)(6) witnesses, and the record does not support a determination that Ecclesiastes operated in good faith.

Accordingly, on these facts, we conclude that *Ehrenhaus's* notice prong was satisfied.

### 5.    Availability of Lesser Sanctions

The district court acknowledged the gravity of the dismissal sanction, but found it to be the only appropriate remedy due to the incurable loss of DeLorean's "unique and critical testimony."  App. at 936.  In the proceedings below, Ecclesiastes failed to identify an appropriate sanction short of dismissal.  Nor has Ecclesiastes done so on appeal.  Thus, the district court did not err in finding the non-availability of lesser sanctions.

## III.    CONCLUSION

The district court thoroughly considered and properly applied the *Ehrenhaus* criteria.  It did not abuse its discretion in dismissing the action pursuant to Rule 41(b).  Accordingly, we **AFFIRM**.